# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CITY OF HIALEAH EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of Nominal Defendants nCINO, INC. (f/k/a Penny HoldCo, Inc.) and nCINO OpCo, Inc. (f/k/a nCino, Inc.), | ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2022-0846-MTZ |
| INSIGHT VENTURE PARTNERS, LLC, INSIGHT HOLDINGS GROUP, LLC, JEFFREY L. HORING, PIERRE NAUDÉ, SPENCER G. LAKE, STEVEN A. COLLINS, JON DOYLE, PAM KILDAY, WILLIAM RUH, and GREG ORENSTEIN, | ) ) ) ) ) ) ) ) ) | |
| Defendants, and | ) ) ) | |
| nCINO, INC. (f/k/a Penny HoldCo, Inc.) and nCINO OpCo, Inc. (f/k/a nCino, Inc.), | ) ) ) ) | |
| Nominal Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: July 25, 2023
Date Decided: December 28, 2023

Thomas Curry, Tayler D. Bolton, SAXENA WHITE P.A., Wilmington, Delaware; David Wales, SAXENA WHITE P.A., White Plains, New York; Adam Warden, SAXENA WHITE P.A., Boca Raton, Florida; Peter B. Andrews, Craig J. Springer, David M. Sborz, Andrew J. Peach, Jackson E. Warren, Jacob D. Jeifa, Wilmington,

Delaware, ANDREWS & SPRINGER LLC, *Attorneys for Plaintiff City of Hialeah Employees' Retirement System*.

Garrett B. Moritz, S. Reiko Rogozen, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Steven M. Farina, George A. Borden, Brian T. Gilmore, WILLIAMS & CONNOLLY LLP, Washington, DC, *Attorneys for Defendants Pierre Naudé, Spencer Lake, Steven Collins, Jon Doyle, Pam Kilday, William Ruh, Greg Orenstein, nCino, Inc., and nCino OpCo., Inc.*

William M. Lafferty, Ryan D. Stottmann, Rachel R. Tunney, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Tariq Mundiya, Jeffrey B. Korn, Richard Li, Ciara A. Sisco, WILLKIE FARR & GALLAGHER LLP, New York, New York, *Attorneys for Defendants Insight Venture Partners, LLC, Insight Holdings Group, LLC, and Jeffrey Horing.*

**ZURN, Vice Chancellor.**

The venture capital fund Insight Partners invested in nCino Inc. ("nCino" or the "Company"). Insight owned most of nCino's stock until a 2020 IPO, and the plaintiff in this case asserts Insight was nCino's de facto controller thereafter. Insight also invested in SimpleNexus, LLC. In November 2020, nCino and SimpleNexus began partnership talks; as those talks progressed, Insight significantly increased its investment in SimpleNexus. By August of 2021, nCino and SimpleNexus changed course and began negotiating an acquisition. In November, nCino's board of directors approved the acquisition at a price of $1.2 billion.

The plaintiff brings six double-derivative claims concerning that acquisition. The complaint frames the transaction as benefitting Insight at nCino's expense, and paints nCino's directors as supine fiduciaries with their heads in the sand. Demand was not excused, so the plaintiff must plead demand futility. It attempts to do so by alleging nCino's board approved the acquisition in bad faith and that a majority of the directors lack independence from Insight.

But the plaintiff failed to establish bad faith or a lack of independence. Because the plaintiff failed to plead demand futility, its claims are dismissed.

1

## I.  BACKGROUND[1]

Nominal defendant nCino provides cloud-based software to financial institutions.[2]  It was cofounded by defendant Pierre Naudé in 2012.  Naudé served as nCino's CEO and a director at all relevant times.  The plaintiff, City of Hialeah Employees' Retirement System ("Plaintiff"), is a purported nCino stockholder.

### A.  Insight Invests In nCino

In 2015, Insight invested $29 million in nCino through its Series B financing round.  nCino and Insight entered into an investor rights agreement granting Insight the right to appoint one Company director.  Insight appointed its managing director and cofounder Jeffrey Horing, who served as a director at all relevant times.

By 2018, Insight held more than 50% of the Company's outstanding shares.  From there, Insight led nCino through its 2020 initial public offering at a nearly $3

---

[1] The facts are drawn from the operative complaint, the documents integral to it, and those incorporated by reference.  *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004).  The plaintiff demanded and received books and records before filing its original complaint in this action, and that production was made pursuant to an agreement including an incorporation by reference provision.  D.I. 26 at Aff. [hereinafter "Rogozen Aff."] Ex. 1 § 18.  Those books and records are incorporated by reference.  *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 796–98 (Del. Ch. 2016), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019).

[2] D.I. 19 at Am. Compl. ¶ 22 [hereinafter "Am. Compl."].  nCino, Inc. underwent a corporate restructuring during the relevant time.  Through the restructuring, a different entity with the same name became nCino OpCo, Inc., and nCino OpCo became a wholly-owned subsidiary of a newly formed entity called Penny HoldCo.  Penny HoldCo was later renamed nCino Inc.  For purposes of clarity, I will refer to the pre- and post-restructuring nCino OpCo, Inc. and nCino, Inc. entities both as "nCino" or the "Company" regardless of their name at the time.

2

billion valuation. The IPO prospectus acknowledged Insight's clout and the possibility that it could "influence the outcome of corporate actions requiring stockholder approval."[3] After the IPO, Insight held about 42% of nCino's shares. In late 2020, Insight reduced its holdings to about 36%. It has since held between 32% and 38% of nCino's outstanding shares.

### B. The SimpleNexus Acquisition

Around November of 2020, nCino began discussions to enter a partnership with a company called SimpleNexus.[4] SimpleNexus was a privately held financial technology company that provided app- and browser-based software connecting consumers to financial institutions; it was also an Insight portfolio company.[5] Partnership talks between nCino and SimpleNexus continued through the end of 2020.

In January of 2021, Insight led SimpleNexus's Series B financing round and increased its stake in the company by $83 million. Insight's total stake amounted to

---

[3] Am. Compl. ¶ 107.

[4] *Id.* ¶ 43. The defendants contend these discussions began in 2021. D.I. 24 at 7 & n.5. At this stage, I accept as true Plaintiff's well-pled allegation that the discussions began in November 2020. *IBEW Loc. Union 481 Defined Contribution Plan & Tr. ex rel. GoDaddy v. Winborne*, 301 A.3d 596, 632 (Del. Ch. 2023) ("At the pleading stage, the court does not decide between competing inferences. The plaintiff receives the benefit of the inference that favors its case.").

[5] Rogozen Aff., Ex. 2 at 1; Am. Compl. ¶ 29.

about 62% of SimpleNexus's outstanding equity. By Plaintiff's math, Insight's two investments implied a valuation of $169 million.

By August of 2021, the partnership discussions evolved into acquisition talks. nCino was interested in acquiring SimpleNexus because it saw "an acceleration of consumer preferences related to how they interact with financial products," which nCino attributed to the COVID-19 pandemic.[6] An internal nCino document concerning the potential acquisition explained that "Consumers now expect to engage with their financial institution[s] . . . in a more convenient, digital, seamless experience" and that this type of delivery "was a 'nice to have' two years ago but today (and going forward) it has become / is becoming a 'table-stakes' element of all market leading solutions in our space."[7] nCino believed SimpleNexus's

---

[6] *See* Rogozen Aff., Ex. 10 at 1. Plaintiff points out that many of the relevant board of directors meeting minutes were approved months after the meeting dates. It also points out that "[t]his Court has declined to give any presumptive weight to minutes finalized after the litigation has commenced, viewing them as a summary of 'Defendants' litigation position' [sic] rather than 'contemporaneous evidence.'" D.I. 42 at 20 [hereinafter "PAB"] (quoting *FrontFour Cap. Grp. LLC v. Taube*, 2019 WL 1313408, at *10 (Del. Ch. Mar. 11, 2019)). Of the five sets of relevant minutes, four were approved after Plaintiff served its books and records demand. *See* Rogozen Aff., Ex. 2 at 6 (confidentiality stipulation dated March 3, 2022). I agree the delay is unsettling, but at the pleading stage, the minutes are being relied upon for context and to color the inferences that can be drawn, not to dislodge any of Plaintiff's affirmative allegations. I would treat the minutes with skepticism at an evidentiary stage.

[7] Rogozen Aff., Ex. 10 at 1–2.

4

technology would complement its existing offerings and allow nCino to meet those emerging preferences.[8]

The Company's board of directors (the "Board") met on August 25, 2021, and "approved the Company proceeding with further investigation of the SimpleNexus acquisition opportunity."[9] The Board also discussed the prospect of retaining an investment bank, asked questions, and discussed the information they received.[10] Horing was not present.[11] He did not attend any subsequent meetings or discussions concerning the SimpleNexus acquisition.[12]

On September 8, the Company's chief corporate development and strategy officer Greg Orenstein scheduled a September 10 Board call to discuss the acquisition. The next day he sent a financial analysis of the transaction, which valued SimpleNexus at $1.2 billion. The supporting analysis consisted of SimpleNexus's management's financial projections through 2022, "management

---

[8] *See id.*; *see also* nCino Inc., Quarterly Report (Form 10-Q), at 12 (June 1, 2022). "The court may take judicial notice of facts publicly available in filings with the SEC." *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1168 (Del. Ch. 2002).

[9] Rogozen Aff., Ex. 12 at 0937.

[10] *Id.*

[11] *Id.*

[12] Rogozen Aff., Ex. 3 at 0927; Rogozen Aff., Ex. 13; Rogozen Aff., Ex. 14; Rogozen Aff., Ex. 17 at 0926.

5

current financial statements, and a one-page spreadsheet."[13]  The materials did not include any implied valuation based on Insight's investments.

Fifty-three minutes before the September 10 Board call, Orenstein sent the Board a draft indication of interest, or IOI.  The IOI contemplated nCino acquiring SimpleNexus for $1.2 billion, consisting of a mix of stock and cash.

At the meeting, Naudé and Orenstein explained that "'following price discussions with SimpleNexus's co-founder . . . and CFO, it was their belief that SimpleNexus would not sell for less than $1.2 billion' and would require at least 25% of the deal consideration to be in cash."[14]  Orenstein explained SimpleNexus initially sought 50% cash and 50% stock, but "subsequently expressed a willingness to accept" a lower ratio that would not require nCino to raise cash to complete the deal.[15]  The Board discussed and asked questions before authorizing the Company to enter into the IOI.[16]

On September 27, Orenstein informed the Board that the Company retained advisors in connection with the acquisition talks.  The Company retained Bank of America Securities as its financial advisor; Sidley Austin as its legal advisor; Accenture "to assist with 'market, competition and product functionality diligence'";

---

[13] Am. Compl. ¶ 67.

[14] *Id.* ¶ 70.

[15] Rogozen Aff., Ex. 13 at 0923.

[16] *Id.*

Ernst & Young to assist with financial and tax diligence; and Cornerstone Advisors "to advise on the 'market opportunity in the U.S. community bank and credit union market.'"[17]

The Board met again on October 7.[18] Accenture updated the Board "regarding their engagement to conduct a market segmentation and functional capabilities analysis of SimpleNexus to support nCino's evaluation of SimpleNexus and their position in the mortgage technology market."[19] Bank of America "provided a transaction overview to the Board, including a review of the strategic rationale for the transaction, certain relevant precedent transactions, a summary process timeline, and near-term next steps."[20] It advised the transaction was "[h]ighly accretive to growth and margin with [an] attractive[ ]valuation."[21] Sidley Austin reviewed the proposed transaction structure.[22] Finally, the Board reviewed "the Company's diligence activities and workstreams," and "authorized the Company's management team to proceed with its due diligence investigation and efforts to negotiate the acquisition of SimpleNexus."[23]

---

[17] Am. Compl. ¶ 75.

[18] Rogozen Aff., Ex. 14 at 0924.

[19] *Id.*

[20] *Id.*

[21] Rogozen Aff., Ex. 15 at 0232.

[22] Rogozen Aff., Ex. 14 at 0924.

[23] *Id.* at 0925.

Orenstein arranged for nCino's directors to speak with SimpleNexus's founder and CFO as part of the diligence process.[24] He set up two separate calls with three directors each "so the interactions [could] be a little more personal."[25] The calls took place on October 22 and 25.[26] Orenstein prepared a briefing document and delivered other materials to the directors before their calls.[27]

The Board met again on November 1.[28] Orenstein updated the Board on the merger negotiations and due diligence process.[29] Other nCino employees reviewed drafts of "the SimpleNexus financial models."[30] "Board members asked questions and there was discussion of the information reviewed and presented."[31]

Orenstein updated the Board via email on November 5.[32] He explained nCino was negotiating for an Insight stock lock-up agreement following the transaction.[33]

---

[24] Rogozen Aff., Ex. 16 at 0158.

[25] *Id.*

[26] *Id.* at 0157.

[27] *Id.*

[28] Rogozen Aff., Ex. 17.

[29] *Id.* at 0926.

[30] *Id.*

[31] *Id.*

[32] Rogozen Aff., Ex. 19.

[33] *Id.* at 0873.

Absent a lock-up agreement, Insight could freely sell its stock immediately upon closing.[34]

On November 15, the Board met to approve the acquisition.[35] Sidley Austin reviewed the tax structure and the merger agreement.[36] Sidley also "noted that . . . Horing and other representatives of Insight . . . had not only been outside of the Board meetings, but also completely 'on the other side of the wall', owing to Insight's ownership of a controlling stake in SimpleNexus."[37] Bank of America presented a fairness opinion.[38] After discussion, "the Board unanimously approved the resolutions approving the transaction."[39]

The acquisition closed on January 7, 2022.[40] nCino paid $933.6 million worth of consideration after price adjustments: 20% in cash and 80% in stock.[41] Insight entered into a lock-up agreement restricting it from selling two-thirds of its nCino stock following closing.[42] Per that agreement, a third of the restricted shares would

---

[34] *Id.*

[35] Rogozen Aff., Ex. 3.

[36] *Id.* at 0927.

[37] *Id.*

[38] *Id.*

[39] *Id.* at 0927–28.

[40] Rogozen Aff., Ex. 2 at 19.

[41] *Id.*

[42] *Id.*

9

become unrestricted six, nine, and twelve months after closing.[43] Insight and its affiliates owned approximately 32.7% of nCino's outstanding shares before closing.[44]

nCino's stock price dropped following the announcement. From the November 16, 2021 announcement "until January 18, 2022 . . . nCino's stock fell from $70.89 to $42.29 per share."[45] While nCino experienced this nearly 30% decline, the Russell 3000 and NASDAQ remained relatively flat.[46]

### C. This Litigation

Plaintiff filed its original complaint in this action on September 21, 2022.[47] It filed its amended complaint on January 27, 2023 (the "Amended Complaint").[48] The Amended Complaint asserts six double derivative causes of action[49] against Insight and nCino's directors and officers. Count I is a breach of fiduciary duty claim against Horing, Naudé, Spencer Lake, Steven Collins, Jon Doyle, Pam Kilday,

---

[43] *Id.*

[44] *Id.*

[45] Am. Compl. ¶ 3.

[46] *Id.*

[47] D.I. 1.

[48] D.I. 19.

[49] "A 'double derivative' action refers to a lawsuit in which a stockholder of a parent corporation brings a derivative suit to enforce the rights of a wholly-owned subsidiary." 2 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 11.06[a], at 11-183 (2023) [hereinafter "Wolfe & Pittenger"].

William Ruh, and Orenstein relating to the SimpleNexus acquisition. Count II claims Horing misused material nonpublic information to Insight's benefit. Count III claims Ruh traded nCino stock using material, nonpublic information regarding the SimpleNexus acquisition. Count IV claims Insight, as a controlling stockholder, breached its fiduciary duties for using its control over nCino to cause it to enter an unfair transaction. Count V is a claim against Insight for aiding and abetting Horing's breaches of fiduciary duty. Count VI is an unjust enrichment claim against Insight.

Naudé, Lake, Collins, Doyle, Kilday, Ruh, and Orenstein (the "nCino Defendants" and together with Horing and Insight, "Defendants") moved to dismiss all claims under Court of Chancery Rule 23.1 for failure to plead demand futility.[50] They also moved under Rule 12(b)(6) to dismiss Counts I and III. Insight and Horing moved under Rule 12(b)(6) to dismiss Counts IV, V, and VI.[51] I heard oral argument on July 25.[52] I conclude Plaintiff failed to plead demand futility. Plaintiff's claims are dismissed.

---

[50] D.I. 26.

[51] D.I. 23; D.I. 24.

[52] D.I. 57; D.I. 58.

11

## II.    ANALYSIS

My analysis begins and ends with demand futility.  Under Court of Chancery Rule 23.1, a derivative complaint "must state with particularity any effort by the derivative plaintiff to obtain the desired action from the entity; and the reasons for not obtaining the action or not making the effort; and allege facts supporting a reasonable inference that the derivative plaintiff has standing to sue."[53]  To meet this "heightened pleading standard,"[54] a stockholder must allege "particularized factual statements that are essential to the claim."[55]  In this regard, Rule 23.1 "departs from the imprecision generally permitted under modern rules of civil procedure."[56]  "[A]s is true in other contexts, the plaintiffs' well-pleaded factual allegations must be taken as true and the complaint has to be read in the light most favorable to the plaintiffs."[57]

---

[53] Ct. Ch. R. 23.1(a) (formatting altered).  Rule 23.1 was amended on September 25, 2023.  *In re: Amendments to Rules 7, 10, 17–25, and 171 of the Court of Chancery Rules, Sections, III, IV, and XVI* (Del. Ch. Sept. 25, 2023) (ORDER).  No substantive revisions were made to the relevant portion of Rule 23.1.  *Id.* at 29.

[54] *United Food & Com. Workers Union v. Zuckerberg* (*Zuckerberg I*), 250 A.3d 862, 876 (Del. Ch. 2020), *aff'd sub nom. United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034 (Del. 2021).

[55] *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).

[56] *Good v. Getty Oil Co.*, 514 A.2d 1104, 1106–07 (Del. Ch. 1986).

[57] *Brehm*, 746 A.2d at 268.

In *Zuckerberg*, our Supreme Court adopted a three-part demand futility test.[58] It asks the following on a director-by-director basis:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[59]

"If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."[60]  Demand futility is analyzed on a claim-by-claim basis.[61]

The demand board comprises seven directors:  Horing, Naudé, Lake, Collins, Ruh, Doyle, and Kilday (the "Demand Board").[62]  The nCino Defendants do not

---

[58] *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg* (*Zuckerberg II*), 262 A.3d 1034, 1059 (Del. 2021).

[59] *Id.*

[60] *Id.*

[61] *In re Vaxart, Inc. S'holder Litig.*, 2021 WL 5858696, at *15 (Del. Ch. Dec. 1, 2021).

[62] The Board included seven directors at the time the original complaint was filed but eight at the time the amended complaint was filed—the eighth is indisputably independent and capable of considering the demand.  Whether the Board has seven or eight directors is not dispositive.  For purposes of this analysis, I consider the Demand Board as it existed at the time the original complaint was filed.  1 Wolfe & Pittenger § 11.03[c][4][iii], at 11-112 ("Delaware courts have clearly stated that the qualification of the board to consider a demand pursuant to the *Aronson* test is to be determined by referencing the composition of

dispute that Horing fails the *Zuckerberg* test. Thus, Plaintiff must plead demand futility as to three of the remaining six directors.

### A. Plaintiff Failed To Plead Demand Futility As To Count I.

Plaintiff argues demand is futile as to Count I's claim for breach of fiduciary duty against the members of the Demand Board. It takes three approaches: (1) Naudé, Lake, Ruh, Collins, Doyle, and Kilday face a substantial likelihood of liability because they approved the acquisition in bad faith; (2) every director owes their current and future nCino directorship to Insight such that they lack independence; and (3) Naudé, Lake, Ruh, Collins, Doyle, and Horing have ties to Insight such that they are not independent.[63] All three arguments fail.

### 1. Substantial Likelihood Of Liability

I begin with Plaintiff's bad faith argument under *Zuckerberg*'s second prong, which asks whether the directors face a substantial likelihood of liability. Because nCino's charter includes a Section 102(b)(7) exculpatory provision,[64] any liability

---

the board as of the time of the filing of the original complaint."); *Rales v. Blasband*, 634 A.2d 927, 935 (Del. 1993) (considering board composition at the time the original complaint was filed); *Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990) (same).

[63] Plaintiff also argues Ruh financially benefitted from the SimpleNexus transaction such that he fails *Zuckerberg*'s first prong, and that he faces a substantial likelihood of liability for a *Brophy* claim. Because I conclude five of the remaining directors pass *Zuckerberg*, I do not consider these arguments.

[64] Rogozen Aff., Ex. 4 § 8.1. The Court may take judicial notice of nCino's charter. *In re Carvana Co. S'holders Litig.*, 2022 WL 3923826, at *2 n.14 (Del. Ch. Aug. 31, 2022).

must be based on a nonexculpated claim.[65]  Plaintiffs argue that Naudé, Lake, Ruh, Collins, Doyle, and Kilday face a substantial likelihood of liability because they approved the SimpleNexus acquisition in bad faith.  "Successfully pleading bad faith . . . leads to a pleading-stage inference that a director could not consider a demand."[66]  Plaintiff focuses on several aspects of the acquisition process:  an alleged lack of price negotiations, the Board's reliance on Bank of America's fairness opinion, and the failure to consider SimpleNexus's valuation based on Insight's January 2021 investment.

Bad faith may be shown "where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, . . . or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."[67]  "Pleading bad faith is a difficult task and requires 'that a director acted inconsistent with his fiduciary duties and, most importantly, that the director *knew* he was so acting.'"[68]  To establish demand futility

---

[65] *See Zuckerberg II*, 262 A.3d at 1060.

[66] *Winborne*, 301 A.3d at 619 (citing *Zuckerberg I*, 250 A.3d at 890).

[67] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006) (internal quotation marks omitted) (quoting *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006)).

[68] *McElrath v. Kalanick*, 224 A.3d 982, 991–92 (Del. 2020) (quoting *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017)); *id.* at 993 ("[A] showing of bad faith in the context of demand excusal is a high hurdle, and essentially requires the plaintiff to demonstrate intentional wrongdoing by the board.").

through allegations of bad faith, a plaintiff must "plead particularized facts that can support a reasonable inference about the directors' state of mind."[69]

First, Plaintiff argues the Board did not discuss the price or otherwise engage on the issue of price, and infers nCino simply accepted SimpleNexus's $1.2 billion offer. The minutes Plaintiff quotes reflect the opposite. At the September 10 meeting, Naudé and Orenstein explained "'it was their belief that SimpleNexus would not sell for less than $1.2 billion' and would require at least 25% of the deal consideration to be in cash."[70] They would know: as Plaintiff alleges, the IOI Orenstein sent the Board "appeared to reflect significant prior negotiations between nCino management and SimpleNexus."[71] The Board reasonably relied on management's opinion, informed by negotiations, that $1.2 billion was the floor. The fairness of that price was later supported by Bank of America's fairness opinion.

Plaintiff also decries that fairness opinion as being "riddled with questionable assumptions that should have raised red flags to the financially sophisticated Board."[72] At bottom, Plaintiff disagrees with Bank of America's analysis. It complains that the financial projections extend too far into the future, that the beta was too low, that the weighted average cost of capital was incorrect, and that the set

---

[69] *Winborne*, 301 A.3d at 619.

[70] Am. Compl. ¶ 70.

[71] *Id.* ¶ 68.

[72] PAB 60.

16

of comparable companies was flawed, among other things. "To support a bad faith claim based on a board's reliance on its advisors' financial analyses, 'the plaintiffs must plead non-conclusory facts creating the reasonable inference that the board purposely relied on analyses that were inaccurate for some improper reason.'"[73] Allegations of bad faith cannot rest on mere disagreements with methodology "or a belief that another financial advisor would have done a better job."[74] Even if Plaintiff's criticisms are well-founded, quibbling with or criticizing a financial analysis falls far short of showing it was so facially flawed as to rebut the presumption that the directors relied on it in good faith.[75]

Plaintiff also attacks the transaction process by claiming there is a significant gap between the acquisition price and the valuation implied by Insight's January 2021 investment. Plaintiff alleges the Board was unaware of that valuation. Without more, a failure to become informed about a data point for valuing an acquisition

---

[73] *In re Paramount Gold & Silver Corp. S'holders Litig.*, 2017 WL 1372659, at *15 (Del. Ch. Apr. 13, 2017) (quoting *In re Morton's Rest. Gp. Inc. S'holders Litig.*, 74 A.3d 656, 673–74 (Del. Ch. 2013)).

[74] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *25 (Del. Ch. Oct. 24, 2014).

[75] *Paramount Gold & Silver*, 2017 WL 1372659, at *15 ("The plaintiffs cannot simply quibble with the inputs used in the fairness opinions." (internal quotation marks omitted) (quoting *Morton's Rest. Gp.*, 74 A.3d 656, 673–74 (Del. Ch. 2013))); *Crimson Expl.*, 2014 WL 5449419, at *25 (declining to find bad faith based on reliance of a financial analysis where the plaintiffs' "allegations boil[ed] down to criticisms" of one methodology as compared to another).

sounds in the duty of care; such a claim does not present a substantial likelihood of liability for the exculpated Board.[76] And while the Court can infer bad faith from a business decision, "the decision must be so extreme that it could not be rationally explained on another basis."[77]

And Plaintiff's implied valuation is insufficiently reliable to anchor a bad faith claim. Plaintiff points to Insight and another investor making investments totaling $128 million for 76.10% of SimpleNexus, which Plaintiff extrapolates to a $169 million implied valuation. One of those investments was a 2018 $20 million "growth capital investment," and another was a $83 million January 2021 Series B investment.[78] Plaintiff assumes SimpleNexus's valuation was the same in 2018 and 2021. This assumption is unreasonable. In addition to general changes in the nature of the investment opportunity, market conditions, and any growth SimpleNexus experienced during that time, the record reveals the pandemic drove changes in how consumers interacted with financial institutions, increasing the importance of SimpleNexus's technology.[79]

---

[76] *McElrath*, 224 A.3d at 993 ("It is not enough to allege that the directors should have been better informed—a due care violation [is] exculpated by the corporation's charter provision.").

[77] *Winborne*, 301 A.3d 596 at 622.

[78] Am. Compl. ¶¶ 44, 48.

[79] *See* Rogozen Aff., Ex. 10 at 1–2.

Turning to the process more generally, Plaintiff accuses the Board of taking an "ostrich-like" approach to the transaction like the Walt Disney Co. board was famously accused of taking in the hiring and resignation of Disney's president.[80] As described in the motion to dismiss decision, Disney's board delegated negotiations over Michael Ovitz's hiring to the company's CEO, who was Ovitz's long-time friend. Despite the decision being "an issue of material importance to their corporation," the board failed to retain advisors or experts, ask questions, or otherwise meaningfully oversee Ovitz throughout the process.[81] It later approved Ovitz's hiring even though it had not seen the final employment agreement. When Ovitz sought to terminate his employment agreement after a little over a year on the job and poor performance, Disney consented to a non-fault termination entitling him to a cash payment of $38 million in addition to stock options, even though he did not qualify for that treatment under the terms of the agreement. Board approval was

---

Plaintiff also argues that the Board agreed to a tax structure that conferred on Insight "millions in tax deferral benefits." Am. Compl. ¶ 89. Plaintiff infers the Company obtained no benefit from this structure because the November 15 minutes do not reflect what the Company received in exchange. The fact that an identified benefit to a counterparty is not specifically coupled to a benefit to the Company does not constitute a particularized allegation of bad faith. Neither does the stock price drop after the transaction was announced. *See Winborne*, 301 A.3d at 621 ("What actually happens down the road is a different issue than whether the decision appears extreme when made. Inferring bad faith because a decision turned out badly would impose liability by hindsight.").

[80] *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 288–89 (Del. Ch. 2003).

[81] *Id.* at 289.

19

required for the non-fault termination, but there was no indication the board ever discussed the matter. The Court concluded that "the defendant directors consciously and intentionally disregarded their responsibilities, adopting a 'we don't care about the risks' attitude concerning a material corporate decision."[82]

Plaintiff has not painted a similar picture here. nCino's Board met five times between August 25 and November 15. At each meeting the Board asked questions and discussed the information it received. The directors spoke with SimpleNexus's founder and CFO on October 22 and 25 as part of the due diligence process. They received updates from management. The Board retained reputable advisors. Horing was walled off from the acquisition process. The Board's meeting minutes reflect that nCino negotiated the cash portion of the deal down from 50% to 20%, which meant nCino would not have to raise cash for the deal. nCino also obtained a lock-up agreement with Insight.[83] It is unreasonable to infer the directors on the Demand Board had their heads in the sand.[84]

---

[82] *Id.*

[83] Am. Compl. ¶ 93; Rogozen Aff., Ex. 2 at 19.

[84] Plaintiff also likens this case to *In re CBS Corp. Stockholder Class Action & Derivative Litigation*. 2021 WL 268779 (Del. Ch. Jan. 27, 2021). The facts of that case are even more inapposite. There, the complaint pled an "extreme set of facts," alleging with particularity that CBS's controller initiated acquisition talks less than a year after the CBS board rejected the same merger and that the controller influenced and disabled the special committee tasked with negotiating and recommending the merger. *Id.* at *37–43. The result was a merger that was "patently unfair" and completed "in order to appease [the controller]." *Id.* at *43. Here, the Amended Complaint is devoid of well-pled allegations that Insight was

20

Plaintiff has failed to plead demand futility based on a substantial likelihood of liability.

## 2.     Lack Of Independence

Plaintiff argues that all directors fail *Zuckerberg*'s third prong because they lack independence from Insight, which received a material benefit from the acquisition and faces a substantial likelihood of liability.  It contends that because Insight previously controlled most of the Company's voting stock and is now a de facto controller, every director "owes their current and future directorship to Insight."[85]  The nCino Defendants concede Insight received a material benefit but deny the directors lack independence.

Delaware law presumes directors are independent.[86]   "[A] lack of independence turns on 'whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party."[87]  "[I]t is important that the trial court

---

involved in the SimpleNexus acquisition beyond Horing's involvement in the partnership talks that preceded the acquisition negotiations.

[85] PAB 22.

[86] *Friedman v. Dolan*, 2015 WL 4040806, at *6 (Del. Ch. June 30, 2015) (citing *In re MFW S'holders Litig.*, 67 A.3d 496, 509 (Del. Ch. 2013)).

[87] *Marchand v. Barnhill*, 212 A.3d 805, 818 (Del. 2019) (alteration in original) (internal quotation marks omitted) (quoting *Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016)).

21

consider all the particularized facts pled by the plaintiffs about the relationships between the director and the interested party in their totality and not in isolation from each other, and draw all reasonable inferences from the totality of those facts in favor of the plaintiffs."[88] The prospect of gaining or losing a directorship can be material.[89] This Court has reasoned that a controller with a history of appointing a director to boards, and the capability to appoint that director to more boards in the future, can inspire a sense of owingness that casts reasonable doubt on the director's impartiality.[90]

Plaintiff argues that each director lacks independence from Insight because Insight elected them to nCino's Board and they depend on Insight for reelection.[91] Assuming Insight is a controller, this argument has some superficial appeal: directorships are generally material and Insight can remove any director at will, so

---

[88] *Del. Cnty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015).

[89] *See Goldstein v. Denner*, 2022 WL 1671006, at *47 (Del. Ch. May 26, 2022) ("Scholars have shown that gaining or losing a directorship is generally material to an individual director.").

[90] *Id.*; *see also In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 54–55 (Del. Ch. 2013) (reasoning a director had a sense of owingness toward a venture capital fund where they had a "long history" and the fund appointed the director to multiple boards and executive officer positions).

[91] Plaintiff has not attempted to reconcile Insight's lack of majority voting power with this position.

every director will appease Insight to retain their seats. But our Supreme Court

rejected this argument in *Beam*.[92] There, the Supreme Court explained,

> [The plaintiff] attempts to bolster her allegations regarding the relationships between [the controller] and Seligman and Moore by emphasizing [the controller's] overwhelming voting control of [the company]. That attempt also fails to create a reasonable doubt of independence. A stockholder's control of a corporation does not excuse presuit demand on the board without particularized allegations of relationships between the directors and the controlling stockholder demonstrating that the directors are beholden to the stockholder. As noted earlier, the relationships alleged by [the plaintiff] do not lead to the inference that the directors were beholden to [the controller] and, thus, unable independently to consider demand. Coupling those relationships with [the controller]'s overwhelming voting control of [the company] does not close that gap.[93]

Any power Insight had or has to appoint and elect directors does not, alone, render

nCino's directors beholden to Insight.

I now turn to Plaintiff's more specific director-by-director arguments.

Plaintiff makes no other argument as to Kilday, so I conclude she is independent for

purposes of demand futility as to Count I. The nCino Defendants concede Horing is

not independent. Plaintiff must plead that three of the remaining five directors lack

---

[92] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1054 (Del. 2004); *see also Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 67–68 (Del. Ch. 2015) (same).

[93] *Beam*, 845 A.2d at 1054 (footnote omitted). The controller in *Beam* held 94% of the company's stock, dwarfing Insight's "excess of 32%" at the time of the SimpleNexus acquisition. *Compare id.* at 1044 n.3, *with* Am. Compl. ¶ 2.

independence. As explained below, Plaintiff has failed to do so for Naudé, Doyle, Lake, and Collins. I do not reach the question of Ruh's independence.

### 1. Naudé

Plaintiff argues Naudé is beholden to Insight because he relies on his position as nCino's CEO for a material portion of his income. Plaintiff has failed to plead this reliance with particularity. It is true that a blocholder as significant as Insight can have influence over a company's executives, especially when the blocholder holds other influential positions at the company.[94] And "[t]he court . . . has explained 'compensation from one's full-time employment is typically of great consequence to the recipient' and thus is generally material."[95] But Plaintiff has not pled with particularity that Naudé is dependent on his CEO salary; to the contrary, Plaintiff pled Naudé has made $49 million in stock sales since the IPO.[96]

Plaintiff also argues that $49 million gain created a sense of owingness to Insight. Again, Plaintiff failed to plead this position with particularity. The Amended Complaint pleads only that Insight invested heavily in nCino before its IPO, that Insight took nCino public, and that Naudé later sold nCino stock for $49 million. Rule 23.1 requires more for the Court to infer that he attributes his nCino

---

[94] *See In re Ltd., Inc.*, 2002 WL 537692, at *5 (Del. Ch. Mar. 27, 2002).

[95] *Goldstein*, 2022 WL 1671006, at *42 (quoting *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 261 n.45 (Del. Ch. 2006)).

[96] Am. Compl. ¶ 106.

wealth to Insight with such singularity and gratitude that the relationship between founder and investor is no longer arms-length, and that he would benefit Insight at the Company's expense and in contravention of his fiduciary duties. Plaintiff has failed to disturb the presumption that Naudé is independent.[97]

## 2. Doyle

Plaintiff argues Doyle's service at the investment bank Piper Sandler supports a finding that he is beholden to Insight. From 2002 to 2020, Doyle served as senior managing principal of Sandler O'Neil + Partners. In 2020, that firm merged with Piper Jaffray and became Piper Sandler. After the merger, Doyle served on Piper Sandler's board of directors and became vice chairman of the board, senior managing principal, and head of the financial service group.

Plaintiff argues Doyle is beholden to Insight to protect Piper Sandler's relationship with its longstanding client. It also argues that the fees Insight paid Piper Sandler were material to Doyle personally. It alleges Piper Sandler underwrote nCino's IPO at a time when Insight held most of the Company's equity. Plaintiff also identifies six IPOs Piper Jaffray underwrote for Insight portfolio companies between 2004 and 2017.

---

[97] Plaintiff devotes one sentence of its brief to the argument that Naudé faces a substantial likelihood of liability for "his involvement in the unfair Transaction." PAB 53. Plaintiff "invested so little in [this] argument[] that [it] can be regarded as waived." *Voigt v. Metcalf*, 2020 WL 614999, at *8 n.3 (Del. Ch. Feb. 10, 2020).

Plaintiff did not allege that Insight had any role in selecting Piper Jaffray as the underwriter for the six IPOs. The Amended Complaint specifies Insight's ownership in only four of the six companies: 10%, 13%, 20%, and 30%.[98] Plaintiff pleads no ownership percentage for the other two. And there are no allegations concerning Insight's influence at any of the six companies. It is not reasonable to infer from its relatively small holdings that Insight selected the underwriter for each IPO. These allegations fail to establish a long-running relationship between Piper Sandler and Insight.

Even assuming Insight selected Piper Jaffray as nCino's 2020 underwriter, Plaintiff failed to show that Insight's business was so important to Doyle as to establish a lack of independence. As Plaintiff emphasizes, "The issue is not the importance of the fees to Piper Sandler generally, but to Doyle in particular."[99] The six transactions Plaintiff identifies occurred while Doyle was employed by Sandler O'Neil, before it merged with Piper Jaffray. It is illogical to impute Insight's business and relationship with Piper Jaffray to Doyle. Plaintiff has failed to show any basis to infer Doyle is beholden to Insight.

---

[98] Am. Compl. ¶ 150.

[99] PAB 52.

### 3.    Lake

Plaintiff argues Lake is beholden to Insight because Lake obtained material compensation both as a consultant to nCino and as a director, and because Lake has previously served on Insight portfolio company boards.  This argument fails.

Lake was appointed as a director in April 2017.[100]  He entered a consulting agreement with nCino in May 2017.[101]  Plaintiff alleges Insight became a controller through two tender offers, the latter of which closed in July of 2018.[102]  Plaintiff did not allege, even in conclusory fashion, that Insight was a controller at the time Lake was appointed to the Board or when he entered into his consulting agreement.  There are no other well-pled allegations that Insight was responsible for Lake's consulting agreement.  And Plaintiff has not alleged Lake's director compensation is material at all or in light of his economic circumstances.[103]  Plaintiff has failed to establish Lake's nCino compensation is material or attributable to Insight.

---

[100] Am. Compl. ¶ 16.

[101] *Id.* ¶ 114.

[102] *Id.* ¶ 33.

[103] *Simons v. Brookfield Asset Mgmt. Inc.*, 2022 WL 223464, at *15 (Del. Ch. Jan. 21, 2022) ("[W]hen director fees are not excessive, mere allegations of payment of director fees are insufficient to create a reasonable doubt as to the director's independence." (citing *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 360 (Del. Ch. 1998)); *see also Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988) ("Plaintiffs plead no facts demonstrating a financial interest on the part of GM's directors.  The only averment permitting such an inference is the allegation that all GM's directors are paid for their services as directors.  However, such allegations, without more, do not establish any financial interest."), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

Plaintiff also argues Lake's directorships for two other Insight portfolio companies overcome the presumption of independence. In July of 2016, Lake was appointed to the board of an Insight-controlled company called Fenergo alongside Insight managing directors. Insight exited its Fenergo investment in 2021, and Lake left the board "shortly thereafter."[104] Lake remained a Fenergo investor and advisor. Plaintiff also alleges that in January of 2018, Insight invested in a company called Duco, and Lake joined Duco's board in September of 2018. But Plaintiff failed to plead any particularized facts attributing Lake's appointment to Duco's board to Insight.[105] At most, Plaintiff has pled Insight appointed Lake to the Fenergo board in 2016, and that Lake served alongside Insight affiliates at Fenergo and Duco: that is not enough to disturb the presumption that he is independent today.

Plaintiff's allegations concerning more recent ties do not disturb that presumption either. In 2019, Lake co-founded Element Ventures, which "operates in the same technology space as Insight," "co-invested" alongside Insight in Fenergo, nCino, and Duco, and touts its relationships with executives of those companies.[106] From there, Plaintiff pleads, "Lake leverages his relationships with Insight and other Insight portfolio companies to attract new investment opportunities

---

[104] Am. Compl. ¶ 120.

[105] *See Flannery v. Genomic Health, Inc.*, 2021 WL 3615540, at *16 (Del. Ch. Aug. 16, 2021).

[106] Am. Compl. ¶¶ 16, 115–17.

28

for his firm."[107] Plaintiff offers no facts to support this extension from "co-investing" alongside Insight to being dependent upon Insight. Plaintiff has failed to plead that Lake lacks independence from Insight.

### 4.    Collins

Plaintiff argues Collins lacks independence from Insight because of his service on the boards of other Insight portfolio companies, and because Collins's nCino director compensation is material. These arguments fail.

In 2004, Insight invested in a company called ExactTarget, and in 2009 it increased its holdings to 35%. Collins served as ExactTarget's executive vice president and CFO beginning in 2011. Insight exited its ExactTarget investment in 2013, but Collins continued to serve through his retirement in early 2014. Collins received over $10 million in compensation for his service. But Plaintiff does not tie Collins's position at ExactTarget to Insight. Plaintiff has not pled any other facts concerning Insight's control over ExactTarget. It is unreasonable to infer that Insight selected Collins for his roles absent allegations of control or other particularized facts.[108]

Plaintiff also alleges Insight placed Collins on the board of a company called Cherwell. In 2012, Insight invested $25 million in Cherwell and received a majority

---

[107] *Id.* ¶ 115.

[108] *See Flannery*, 2021 WL 3615540, at *16.

interest.[109]  Three years later, Collins accepted a position on Cherwell's advisory board, where he remained until 2018.[110]  Plaintiff does not plead Collins's compensation for his service on the advisory board.  While it is reasonable to infer Insight had some role in appointing Collins given its majority stake, there are no facts from which I can infer Collins has a sense of owingness—indeed, Plaintiff did not plead that Collins was paid for his role at all.

Plaintiff also alleges Collins joined the board of a company called Instructure, Inc. in 2014, and that Insight invested in Instructure later that year.  Plaintiff failed to plead with particularity that Collins's appointment was tied to Insight, or that Insight invested because Collins was on the board.

Finally, Plaintiff also argues that Collins receives a material portion of his income from his nCino directorship.  It contends that Collins's director fees "represented about 35.8% of his annual income," and that such a percentage is material under our law.[111]  Even accepting this as true, Plaintiff has not pled Insight has the power to remove Collins or substantially affect his role as a director, so

[109] Am. Compl. ¶ 134.

[110] *Id.*

[111] PAB 34.

30

Collins is not beholden to Insight by virtue of that income.[112] I conclude Collins is independent of Insight.[113]

* * *

Having concluded Kilday, Lake, Naudé, Doyle, and Collins are independent of Insight, Plaintiff has failed to allege a majority of the seven-director Demand Board fails the *Zuckerberg* test. Plaintiff failed to plead demand futility as to Count I.[114]

## B.    The Remaining Counts

I now turn to whether demand is futile as to the remaining counts. Count II asserts a claim for misuse of confidential information against Horing. It alleges Horing used confidential information about the SimpleNexus acquisition to increase Insight's investment in SimpleNexus. For the above reasons, a majority of the Demand Board is independent of Insight. There are no allegations that the Demand

---

[112] *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 177 (Del. Ch. 2005) ("This Court will not find a director beholden unless the purported controlling person has 'unilateral' power to substantially affect the director." (quoting *Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002)), *aff'd*, 906 A.2d 114 (Del. 2006). In addition, in 2022, Collins's $225,037 in director compensation comprised $171,037 in nCino stock and only $54,000 in cash. Rogozen Aff., Ex. 2 at 21.

[113] Plaintiff also points out that Collins served alongside an Insight affiliate on another board. This does not change my conclusion.

[114] Plaintiff has identified no separate reason the Demand Board could not consider Count I as asserted against Orenstein or Naudé in their officer capacities. Plaintiff has failed to plead demand futility as to Count I.

31

Board received a material personal benefit from Horing's activities, that they face a substantial likelihood of liability in connection with this claim, or that they lack independence from Horing. Plaintiff failed to plead demand futility as to Count II.

Count III is a *Brophy* claim against Ruh.[115] It alleges Ruh knew the SimpleNexus acquisition would harm nCino's stock price and traded on that information before the acquisition was announced in November 2021. Plaintiff argues that Count III is properly considered part of the SimpleNexus acquisition for demand futility purposes, such that most directors face a substantial likelihood of liability in connection with it or are otherwise incapable of considering the demand. As explained above, the Demand Board was capable of considering a demand for a claim arising out of the SimpleNexus acquisition. Plaintiff did not plead these directors otherwise received a material personal benefit in connection with Ruh's trading or that they lack independence from Ruh. Plaintiff failed to plead demand futility as to Count III.

Finally, I turn to the remaining three claims against Insight. Count IV asserts a claim for breach of fiduciary duty against Insight as a controlling stockholder in connection with the SimpleNexus acquisition. Count V asserts a claim against Insight for aiding and abetting Horing's breaches of fiduciary duty in connection

---

[115] *See Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949).

with the SimpleNexus acquisition. Count VI is a claim for unjust enrichment, also relating to the SimpleNexus acquisition. For the reasons explained, most of the Demand Board is independent of Insight. Plaintiff failed to plead demand futility as to Counts IV, V, and VI.

## III. CONCLUSION

The motion to dismiss is GRANTED.